Paul J. Esquire, Council for Appalachia, Sarita, Namaskwes, please come to the podium. Please come on up and introduce yourself. Good morning, Your Honors. My name is Metu Ogike. Thank you for letting me be here to argue for the appellate. How much time would you like to reserve for your rebuttal? About five minutes, Your Honor. Five minutes, okay. Go ahead, please. Thank you, Your Honors. Like we've been told, and like Your Honor has pointed out, my intention here is not to rehash everything that's in our brief, but I think that what we want to do is to point out the most important point in our brief. We're here because the issue really is whether our client has violated Section 520. I'm sorry, this is my first time in front of you, so I'm a bit nervous. The issue here is whether 523A6 has been violated by our client who was a landlord and was facing issues, and there was an issue with water service to the tenants at that apartment. What we're trying to actually emphasize for the court, and we hope the court sees our point, is that the standard to violate 523AC is really high, and if our client has been seen to be a very, very bad landlord who has been negligent and who had no business being a landlord, that is a story for a negligence cause of action. But for 523A, you actually have to show that she intentionally targeted this tenant. And there's one specific thing that we just want to point out. I'm not going to take too much of your time, because there's nothing new actually I want to add to my brief. If you look at the sequence of events which was not disputed during the trial, and I do realize that the trial court made decisions when it comes to our client not being credible, but that doesn't dispute the sequence of events where you have our client who says, I have no money to continue to maintain this place for several reasons which were not disputed, one being that she now was in a divorce and she couldn't pay the bills anymore. She actually comes and says, calls the clients, and this is not disputed, the tenants, and says, I cannot pay this water bill anymore. Therefore, I can't continue to pay it. Other tenants now take over payment of that water service, and it continues to run for over 20 months. She did nothing to try to stop the tenants from continuing to pay the water bill and continue to have the water run. There are about six or seven units in there. Was that the first problem at the premises? Was the water bill the first problem, or was it maybe the third problem? There were other problems before that, right? Yes, there were other problems. We have to decide whether the trial court, if it drew some inferences, whether they were appropriate inferences. I'm sorry, say that again? I said if the trial court drew some inferences from behavior, we have to decide if there's any problem with that. What you're saying is that she didn't mean to turn off the water, okay. Yes. But this is the third problem with the premises, right? There was an electricity problem and a gas problem and then a water problem, right? Yes, you're right. Okay. But again, the primary problem here and the primary reason why we are at the adversary hearing was the water issue. As a matter of fact, prior to trial, the court had made orders saying that the only issue we're going to discuss in this case is the issue of water supply. And so, as a matter of fact, to emphasize that point, we filed a motion eliminating, asking that the only issue here be the issue of the water supply. So the primary issue here why the 523A comes up is whether our client turned off the water to intentionally hurt this particular tenant. That is the primary issue here. And I'm saying that what we're trying to point out here is the sequence of events doesn't even allow this factual pattern to rise to the standard set by 523AC. If you look at 523AC, it says it has to be willful, malicious, and targeted at this person. Why if she was so unable to provide water, which seems, as the court found, to be a necessary element for the habitability of the premises, this was a month-to-month lease. Why keep renting it? Why didn't she just end the lease? And I can try to answer that question. The issue here is that, again, it goes back to the issue of maybe the argument being that she was a bad landlord, because she had tried. She had tried to evict this client. Well, she had told her to get out. Well, again, she didn't actually tell her to get out. And that goes to Judge Lafferty's point is that you're kind of stuck with the record. I mean, your client said that she didn't tell her, but Ms. Velasquez said that she was told, and the judge found that credible. So aren't we stuck with that for this? Well, even if we're stuck with that, we still have to come back to the sequence of events and when that water was actually turned off. Listen, the water, she can't pay the water anymore. She does nothing to prevent the tenant from continuing the water service. This runs for 20 months. Now, landlords say horrible things sometimes. I understand that. But, again, we're talking about 523 AC. We're not talking about a negligent standard of conduct. We're talking about 523 AC. She has to show, specifically from this water being disconnected, that she was targeted. Didn't the trial court make that finding that there was willfulness, there was maliciousness? Isn't that a finding in the record? And that is the reason why we're before Ms. Velasquez. Okay, so the finding is there. You're arguing that it's erroneous. Yes. That's basically what we're saying, that even if the sequence of events here sets really a high standard. But on the other side, there was a high standard in the trial court, but now you face the standard of review of showing clear error, and that's a high standard. So I think you're the side at this point in the case that faces the high standard. Well, that's true, Your Honor. I will agree to that. But what I'm saying again is we're asking this panel to please look at the set of facts. Because if our client, based on the sequence of events of how this water was turned off, is liable for violating this rule, then the standard, the bar has been lowered for a violation of 523 AC. It's been, because there were six tenants. It's not disputed that she didn't have the financial ability not to continue repayment. She actually tells them, and she does nothing to stop one tenant from continuing the water service for 20 months. Yeah, but there's another fact here in the record, which I think undercuts what you're saying. And that is that she did attempt to evict one of the other tenants, and apparently was unsuccessful in court. So you could then draw the inference, I think, the trial court did draw the inference that she wanted to get these people out of the building, because the trial court found that she had told them that, had decided that the formal legal eviction process wouldn't work, and picked a different way, which is basically to starve them out. And again, it goes, we're talking about this statute, it goes again to her intent. She is attempting to evict people who are not paying her any rent. Let's take the appellee in this case. She didn't pay rent for so many months, and she doesn't present any evidence that she paid any rent. So if, again, if we're talking about the eviction process. She presented her testimony. Yes, Your Honor. And the judge specifically found that. I mean, he addressed that. He found there was no reason, that goes to your offset claim, that you had not established the predicate debt to be offset against based upon her testimony that she had paid. Yes, Judge Pricker, but again, if we look, go back to the core of this is what it's all about. The issue here is, when the water service was interrupted, what was our client's specific intent? Now. Again, isn't that addressed? I'm looking at the decision, and the bankruptcy judge wrote that the hater testified that the only reason she did not restore water service to the property was because she could not afford to do so. This testimony is not credible. And he goes on to explain why. I mean, he kind of considered that but rejected it. Yes. And what we're trying to present in front of the court to counter that is, if you have a client, if you have our client, if her intent was to really injure this particular tenant, what stops her from going to the water department and saying, no, do not turn this water back on again? She had the power to do that. She didn't. What you have here is a really, really bad landlord. Well, the statement that the judge credited about child services coming and you should leave kind of flavors that, too, doesn't it? And, again, I would defer to the trial judge for his findings of who is credible or not. But if you look at what our client said, she said she was being advised by child services, you have to go do something. Go talk to these people. They can't continue to stay there, especially if the kid's involved with no water running. Again, it's a case of a bad landlord. But go back to when this ‑‑ she actually stops paying this thing in February of 2013. The water is not turned off until 20 months later. You have about five minutes left. If you want to reserve the time, this would be a good time. I'll reserve that, Your Honor. Thank you. Mr. Estuar. Good morning, Your Honors. Before I get started, was there any particular question that the court wanted me to address, would like me to address? I think you can go ahead and address the point that opposing counsel is making, that there is testimony or some evidence in the record that one of the tenants had assumed the water bill, and why isn't that evidence of an inability to pay? Your Honors, there's also evidence in the record, and I'm not going to sort of argue against the record, which is what I think Appellate is trying to do here. The key is, and I think the trial court noted in its memorandum, was that there's no credible evidence that the appellant ever attempted to turn the water back on. In fact, the court found that the appellant likely, under the rules covering utilities, could have started up the water on their own, paid some monthly charge, and get the water running, or as a licensed real estate professional, could have either instituted an unlawful detainer, and there's no evidence that that was ever tried. Well, that would have been the logical remedy if people weren't paying rent. That would, LAFLA does this quite a lot, so we see that quite a bit, three-day notices. It would have been difficult in this situation because with the water turned off, there are some defenses available to the tenant, but that is typically what landlords want to do if they don't want tenants in there, and frankly, the court already found that it wasn't credible, that for some reason or another they didn't want to file an unlawful detainer because they were afraid of certain tenants. And I think the appellant mentioned during argument that he would defer to the judge on findings of who is credible, and I think that's important in this situation, and I think that colors a lot of what happened at the trial court, is that the appellant's testimony simply was not credible based on inconsistencies, failures to answer, the fact that she was a licensed real estate professional who frankly had another investment property in Arizona, and then all of a sudden doesn't know what to do with this six-unit property where people had their, I think as you'd mentioned, Judge Lafferty, this is the third time it was gas, the tenants managed to put that in their name, electricity, tenants managed to put that in their name, and now water. Yeah, and I think the significance there is not, I mean, it may have been the trial court was focused on water because that's a unique kind of problem, but if you're talking about inferences, the fact this was the third problem might be something you'd want to consider. Right, absolutely. And then you take into account the other facts in this case brought in by my client, where she made multiple attempts reaching out to a CBO by the name of Sage to try to mediate the issue, and it just, having to deal with DCFS coming into the home and essentially strip-searching the children just to make sure that they're okay and having to worry about things like that, having to, and then, you know, we get into the issue of damages, which they didn't really argue during our argument, but what I think sort of we dealt with in our brief and that there was sort of ample finding that this warrant, this situation, you know, almost a year's worth of having no water and all sort of the consequent damages that our client testified to warranted the maximum allowable daily damage amount of $100. And so there's really sort of no basis here that I've heard that we've seen in the record that warrants a reversal or any reconsideration of the trial court's ruling in this case. Did the court have any other further questions for me? No questions. Thank you very much.  Appellee will rest. Thank you, Your Honor. Thank you. Thank you. Mr. Ogike. Could you pronounce your last name for me again? Ogike. Ogike. Yes. Okay, thank you. Please go ahead. First of all, I think I kind of heard some of the things that counsel have just talked about. Most of the references that counsel have just made to you are things that happened way after our client was unable to pay her water bill anymore. I think that the controlling rule here is at the time our client was unable to pay the water bill anymore and at the time that she told the tenants that she couldn't pay, what was her state of mind? References about what happened with strip searching, keys later on down the fact which would dispute the fact that she was being told to turn on the water again and she refused. First of all, she didn't refuse. Her financial issues continued. But again, I think that at the time that she couldn't pay the water anymore, at the time that she said turn it over and allow somebody else to take over the payment, what was her state of mind? And what did she do at that point, if anything, to stop the water? The facts are clear. Other tenants took over the payment. She didn't stop them from taking over the payment. If she had stopped them from taking over the payment and then stopped the water, interrupted the water supply, as of February of 2013, then maybe we'll have a different conversation. That didn't happen. That's not the standard. The standard is at the time that she acted, what was the issue? Now, going to her credibility, I think that one of the things, and I've made references about being a bad landlord. I don't really believe that my client was a bad landlord. I'm just saying that if anything happened here, this is what the judge, this is what the decision looks like. Things were done wrong. But we're here not because of any other statute. We're here because of 523A6. And at the time, in February of 2013, going 20 months, at the time that she interrupted the water, she couldn't pay. What was her state of mind? I think I have other things to talk about. I think at this point that this panel has read the record. You kind of know what to do. But please, again, I want to emphasize the fact that February 2013 is what controls what was her state of mind at the time she made that decision. Thank you, Your Honor. Thank you very much. Thanks, both sides, for your very good arguments. The matter is submitted.
judges: Faris, Lafferty, and Spraker